## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| ELITE CONSTRUCTION DESIGN MANAGEMENT LLC, *et al.*, | : | |
| | : | |
| | : | |
| *Plaintiffs*, | : | Case No. 2:23-cv-820 |
| | : | |
| v. | : | District Judge Jeffery P. Hopkins |
| | : | |
| WALTER EVERETT KERSCHNER, JR. *et al.*, | : | |
| | : | |
| | : | |
| *Defendants*. | : | |

---

### OPINION AND ORDER

---

Elite Construction Design Management, LLC and Timothy Reeves (collectively, the "Plaintiffs") brought this action seeking to deny the Debtors, Walter ("Sonny") and Angela Kerschner (hereinafter the "Debtors" or the "Kerschners"), a discharge under 11 U.S.C. § 727. The Plaintiffs allege that the Kerschners made false oaths on their bankruptcy petition and subsequent filings in violation of § 727(a)(4)(A) by making numerous false statements about their income, expenses, and household size in order to satisfy the eligibility requirements for Chapter 7 relief. Following a bench trial, the Court finds, for the reasons stated below, that the Debtors violated § 727(a)(4)(A) and that the Debtors should therefore be denied a discharge in their bankruptcy case.

### I.  Jurisdiction and Constitutional Authority

This adversary proceeding was filed and heard before the undersigned while a judge on the United States Bankruptcy Court for the Southern District of Ohio. After being appointed to the district court, a court which has original jurisdiction over bankruptcy cases

filed in this district, the undersigned entered an order withdrawing the reference under 28 U.S.C. § 157(d) for cause and on joint motion of the parties. Distr. Doc. 3.[1] When the trial was held, the bankruptcy court had jurisdiction, under 28 U.S.C. § 1334(b) and the general order of reference entered in this district under 28 U.S.C. § 157(a), to hear and determine this matter—a core proceeding under 28 U.S.C. § 157(b)(2)(J). Because a debtor's entitlement to a discharge "stems from the bankruptcy itself," *Stern v. Marshall*, 564 U.S. 462, 499 (2011), the bankruptcy court had the constitutional authority to enter a final judgment in this proceeding. *See Dilbay v. Demir (In re Demir)*, 500 B.R. 913, 918 (Bankr. N.D. Ill. 2013). The Court continues to have jurisdiction over this proceeding since the withdrawal of the reference.

## II.   Procedural History

The Kerschners filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code through counsel, Gary Kenworthy, on December 26, 2018. The Plaintiffs timely brought this adversary proceeding seeking a determination not only that the debt allegedly owed to them was nondischargeable under § 523(a)(6), but also that the Debtors should be denied a discharge altogether under § 727(a)(4)(A). The parties agreed to bifurcate the matter, holding the § 523 claim in abeyance pending the outcome of this § 727 denial of discharge action. *See* Adv. Doc. 58.

---

[1] The Court will refer to any documents filed in the Debtor's main bankruptcy case, *In re Kerschner*, No. 18-bk-58000 (Bankr. S.D. Ohio), as "Bankr. Doc. —" and any documents filed in the bankruptcy court adversary proceeding, *Elite Construction Design Management, LLC, et al. v. Kerschner, et al.*, No. 19-ap-2026 (Bankr. S.D. Ohio), as "Adv. Doc. —." Any references to this Court's docket will be "Distr. Doc. —."

Before the trial, the parties filed certain stipulations (Adv. Doc. 67), and the Plaintiffs filed a pretrial brief (Adv. Doc. 107). During the bench trial held April 8–9, 2021[2] the Court heard the testimony of the two Debtors, Walter Kerschner, Jr. and Angela Kerschner; Blaine Hardin, an individual who the Debtors included as a dependent in certain filings; Gary Kenworthy, the Debtors' former attorney who represented them at the time of their Chapter 7 bankruptcy filing and amendments; and the then-attorney Mina Nami Khorrami, who was called by the Plaintiffs to testify as an expert witness regarding the Debtors' eligibility for Chapter 7 bankruptcy relief and to review the Debtors' petition related filings.[3] The parties' Joint Exhibits 1–18 and 21–39 were admitted into evidence. *See* Adv. Docs. 119 & 119-1 (the "Transcript") at 409. The parties requested to submit their closing arguments through post-trial briefs following the docketing of the Transcript. *Id.* at 409, 416; *see also* Adv. Docs. 121 & 124. With the filing of those briefs, *see* Adv. Docs. 127, 128, & 131, the Court took the matter under advisement.

### III. Findings of Fact

Based on the evidence adduced at trial, including the documentary evidence and the testimony provided, and having considered the demeanor and credibility of each of the witnesses, the Court makes the findings of fact set forth below.

---

[2] This case was tried during the COVID-19 pandemic. To protect the health and safety of the litigants and court staff, the case was tried remotely with lawyers and witnesses appearing *via* Zoom for Government. *See* Bankr. S.D. Ohio Gen. Order 35-8, *Order Regarding Matters Scheduled Before the Court Until Further Notice* (Sept. 17, 2020); Bankr. S.D. Ohio Gen. Order 44-1, *Order Regarding Virtual Hearings* (Aug. 21, 2020).

[3] At the time of her testimony, Judge Nami Khorrami was a licensed practicing bankruptcy and commercial litigation attorney at Mina Nami Khorrami, LLC. *See* Joint Ex. 21 at 7–9. Subsequently, on September 10, 2021, she was appointed by the U.S. Court of Appeals for the Sixth Circuit to serve as bankruptcy judge for the Southern District of Ohio. Hereinafter, Judge Nami Khorrami will be referred to as "Plaintiffs' bankruptcy expert" or "Ms. Khorrami," given her status at the time of her testimony.

**A.    Background**

**1.    Debtors' Employment and Sources of Income**

The Debtors testified that in the months leading up to their bankruptcy filing they had four sources of income: (1) income from Mr. Kerschner's handyman work through Home Advisor, paid to TLK Mechanical Solutions, LLC ("TLK"); (2) income from TLK's work for Rhoads Construction, Inc.; (3) income from Rhoads Construction paid directly to Walter Kerschner; and (4) Angela Kerschner's salary from the U.S. Department of Agriculture. *See* Tr. at 70–73, 76, 163–66.

Debtor Walter Kerschner testified that he worked as a field supervisor for Tim Reeves at Elite Construction Management from March 2017 until September 2017. *Id.* at 126–27. Two weeks before quitting his position at Elite Construction Management, Mr. Kerschner was offered a job at Rhoads Construction. *Id.* at 128–29. Mr. Kerschner testified that for the majority of his time working for Rhoads Construction he "was 1099 . . . as TLK Mechanical Solutions." *Id.* at 130. That is, Rhoads Construction hired TLK, and Mr. Kerschner worked for Rhoads via his own entity, TLK. From Mr. Kerschner's recollection, he believes that Rhodes was paying TLK this way for about a year, but then converted to paying him personally as a W2 employee during his final months working for the company. *Id.* at 131.

**2.    Debtors' Financial Records**

**a.    Record of Income**

At the time of the bankruptcy filing in December 2018, Mr. Kerschner had not yet received a W-2 from Rhoads Construction and did not have a 1099 form to provide to the Debtors' bankruptcy attorney, Mr. Kenworthy. *Id.* at 131–32. Without the benefit of these documents, the Kerschners calculated their income at the time of the bankruptcy filing by providing their bankruptcy attorney, Mr. Kenworthy, with hard copies of paystubs and the

4

invoices and associated checks that TLK received for the work completed for Rhoads Construction. *Id.* at 131–32. However, testimony revealed that the documentation of income provided to Mr. Kenworthy was incomplete, and income was understated in initial filings due in part to computations errors. *See id.* at 263–265.

   b.   **Bank Accounts**

The Debtors disclosed three bank accounts in their bankruptcy filings: (1) a personal account held by Angela and Walter Kerschner (the "Personal Bank Account"), (2) a business account held by TLK Transportation LLC (the "TLK Bank Account"), and (3) an account for the Debtors' son, Tanner Kerschner (the "Tanner Kerschner Bank Account"). *See id.* at 168; Joint Exhibits 7–9. The Debtors and their trial attorney referred to the TLK Bank Account as "the gold standard," meaning that it reflected all records of the income and expenses for TLK. *See, e.g.,* Tr. at 32, 92, 137, 206. However, as it turns out, the Debtors used the TLK Bank Account for both business and personal expenses. *Id.* at 33, 93–95, 279. Because the TLK Bank Account was used to pay for personal expenses, the Debtors' Bankruptcy Attorney, Mr. Kenworthy, was unable to rely entirely upon those bank statements to determine the Debtors' business expenses. *Id.* at 279. Instead, Mr. Kenworthy turned to Angela Kerschner to prepare spreadsheets of TLK's expenses, which he then relied on to complete the bankruptcy filings.[4] *Id.* at 185, 251–52; Joint Exhibit 11 Page 22 of 23; Tr. 181–82, 265–66, Joint Exhibit 18.

---

[4] The Debtors testified that Mrs. Kerschner was solely responsible for maintaining the family's financial records. *See* Tr. at 140, 161–62.

        **c.**      **General Ledger**

The TLK General Ledger, marked as Joint Exhibit 14, was created using TLK's bank account records, and purportedly included all TLK's income and expenses. Tr. at 171–72. The General Ledger was created by the Debtors' accountant, Eddie Gomer, who unfortunately passed away just prior to the bench trial commencing. *Id.* at 203. On direct examination, Mrs. Kerschner said the following with respect to the creation of the General Ledger:

> Q. Ms. Kerschner, you testified that the general ledger that we marked as exhibit number, Joint Exhibit 14 is true and accurate information that you entered into it, correct?
>
> A. I entered QuickBooks and then Eddie went through and redid any expenses he took out that he didn't need. So that's off of, that's created off of Eddie redoing my input.
>
> . . .
>
> A. Which would be our final taxes.
>
> Q. Okay, but any individual, you know, money coming in, money coming out, TLK, what's in the general ledger, that's all based off of information that you entered into QuickBooks, correct?
>
> A. Yes, correct.

*Id.* at 212.

With respect to what financial information was available at the time of the bankruptcy filing, Mrs. Kerschner testified that she reconciled her bank statement monthly, but did not input any information into QuickBooks until the end of the year. *Id.* at 213–14. However, she acknowledged that the business expense information entered into QuickBooks was generated from the TLK Bank Account statements, which were available at the time of filing. *Id.*

### d.    Expense Spreadsheets Created by Angela Kerschner

Mrs. Kerschner testified that she created multiple spreadsheets listing TLK's expenses, which Mr. Kenworthy used for the initial bankruptcy filing and subsequent amendments. *Id.* at 185, 251–52; Joint Exhibit 11 Page 22 of 23; Tr. 181–82, 265–66, Joint Exhibit 18. Prior to the initial filing, Mrs. Kerschner created a spreadsheet for Mr. Kenworthy that included a monthly breakdown of TLK's expenses for 2018. *See* Joint Exhibit 11, page 22 of 23 (the "First Expense Summary"); Tr. at 184–85, 251–52. Mr. Kenworthy used this information to prepare the First Means Test. *Id.* at 251–52. Two years later, Mrs. Kerschner created another expense summary for Mr. Kenworthy, which details TLK's expenses from June through November of 2018. *Id.* at 181–82, 185–86, 265; Joint Exhibit 18, pages 2–3 of 3 (the "Second Expense Summary", collectively the "Expense Summaries").

None of the expense figures contained in the Second Expense Summary match the figures contained in the First Expense Summary. *See* Tr. at 265–69 (discussing differences between the Expense Summaries); *Id.* at 185–87 (Testimony of Angela Kerschner acknowledging that the Expense Summaries did not match). While the figures provided by some months only vary slightly, *compare* First Expense Summary ($3,238 for September of 2018) *with* Second Expense Summary ($3,193.78 for September of 2018), others vary significantly, *compare* First Expense Summary ($2,304 for October) *with* Second Expense Summary ($5,733.01 for October). Tr. at 268. The Expense Summaries also cannot be reconciled with the expenses listed in TLK's general ledger, even though all three documents were created by Mrs. Kerschner using the TLK Bank Account statements. *Id.* at 184–85, 212–213, 215–217.

7

B.     **Bankruptcy Filings and Amendments**

The Debtors filed their petition on December 26, 2018. Joint Exhibit 1. The Debtors'

first means test reflected that they had an annual income of $77,180.28 and three dependents.

Bankr. Doc. 1 at 52; Joint Ex. 1 at 52 (the "First Means Test"). By claiming three dependents,

the Debtors' remained under the median income of $95,721 for a household of five, thereby

resulting in no presumption of abuse. The Debtors later filed two amended means test

calculations—first on November 4, 2020 (Bankr. Doc. 34) (the "Second Means Test"), and

then on January 7, 2021 (Bankr. Doc. 36) (the "Third Means Test").

The Debtors' bankruptcy attorney, Mr. Kenworthy, testified that the First Means Test

was amended to reduce the household size from five to two in order to "clean things up" and

avoid creating issues for the bankruptcy litigation. Tr. at 282–84. Then, the means test was

amended again in January 2021 but only after Mr. Kenworthy reviewed the Plaintiff's Expert

Report and discovered that pay checks for both Debtors had been omitted from the initial

filings, resulting in an underreporting of the Debtors' W-2 income. *Id.* at 261–62. Consistent

with the pattern that was emerging, the Debtors' Third Means test filed in the case witnessed

an increase in the household size from two to four to again satisfy the means test. *Id.* at 284–

85.

The Debtors' initial filings and subsequent amendments also included changes to their

personal and business income and expenses. The following chart was reproduced (with non-

substantive formatting changes) from the Plaintiff's Motion in Limine (Adv. Doc. 73):

| Category | 1st Means Test | 2nd Means Test | 3rd Means Test | % Change |
|---|---|---|---|---|
| Household Size (122A-1, Line 13) | 5 people | 2 people | 4 people | + 100% |
| Walter's Income (Line 2) | $ 913.80 | $ 913.80 | $ 1,169.79 | + 28% |
| Angela's Income (Line 2) | $ 3,297.60 | $ 3,297.60 | $ 3,570.13 | + 8% |
| Business Gross Receipts (Line 6) | $ 4,785.51 | $ 4,785.51 | $ 5,069.51 | + 6% |
| Business Expenses (Line 6) | $ 3,205.22 | $ 3,205.22 | $ 3,061.73 | − 4% |

| | | | |
|---|---|---|---|
| Business Net Income (Line 6) | $ 1,580.29 | $ 1,580.29 | $ 2,007.78 | + 27% |
| Current Monthly Income (Line 12a) | $ 6,431.69 | $ 6,431.69 | $ 7,387.70 | + 14% |
| Annual Income (Line 12b) | $ 77,180.28 | $ 77,180.28 | $88,652.40 | |
| Median Family Income (Line 13) | $ 95,721.00 | $ 60,822.00 | $ 87,321.00 | |
| Food & Clothing (122A-2, Line 6) | N/A | $ 1,202.00 | $ 1,694.00 | + 40% |
| Health Care (Line 7g) | N/A | $ 104.00 | $ 208.00 | + 100% |
| Utilities (Line 8) | N/A | $ 567.00 | $ 666.00 | + 17% |
| Net Mortgage Expense (Line 9c) | N/A | $ 0.00 | $ 16.88 | |
| Taxes (Line 16) | N/A | $ 922.10 | $ 1,265.10 | + 37% |
| Involuntary Deductions (Line 17) | N/A | $ 114.79 | $ 163.38 | + 42% |
| Life Insurance (Line 18) | N/A | $ 0.00 | $ 31.80 | |
| Health Insurance (Line 25) | N/A | $ 421.74 | $ 372.32 | − 12% |
| Secured Debt Payments (Line 33d) | N/A | $ 2,479.91 | $ 2,524.41 | + 2% |
| Total Disposable Income (Line 39d) | N/A | $ 1,935.00 | $ (8,525.40) | − 540% |

### 1.    Inconsistencies in Bankruptcy Filings

There were various inconsistencies and apparent omissions in the Debtors' bankruptcy filings and financial records. In their testimony, the Debtors suggested many of the inconsistencies related to the categorization of the expenses by Eddie Gomer, the Debtors' accountant, in preparing their taxes. *See, e.g.*, Tr. at 119, 123, 140, 203, 205–06 (Debtors' testimony discussing Mr. Gomer's role and categorizations). Mrs. Kerschner testified that Mr. Gomer created the General Ledger and the TLK profit and loss statements using the Debtors' bank statements and QuickBooks. *Id*. at 205–06. However, Mrs. Kerschner indicated that Mr. Gomer did not have direct access to the TLK Bank Account; he just had access to QuickBooks data that *she* entered. *See id.* at 206 ("Q. Did you provide him monthly [bank] statements, did he have access to the computer online banking? A. He had it just off of QuickBooks where I had entered into my Chase account.")

Regardless of Mr. Gomer's categorizations, testimony confirmed that the determination of what items could properly be considered income or expenses should have been possible by looking at the Debtors' accounts. *See id*. at 296–97. Put another way, recategorizing specific expenses should not have altered fixed expense figures.

9

### a. Household Size

As noted, the Debtors made changes to their household size in all three of their means tests and schedules associated with each that were filed with the Court. In the First Means Test, the Debtors claimed they had a household size of five, identifying their son Tanner Kerschner, their daughter Taylor Kerschner-Moody, and their daughter's boyfriend Blaine Hardin as dependents. *Id.* at 61. At the time, Tanner, Taylor, and Blaine were all legal adults and none were full-time students. *Id.* at 62–63. Neither of these three individuals were claimed as dependents on the Debtors' 2017 and 2018 tax returns. *Id.* at 64.

In the Second Means Test, filed almost two years after the petition date, the Debtors claimed a household size of two—only including themselves—as might have been proper under the circumstances. *Id.* at 66. At trial, Mr. Kenworthy testified, however, that this change was made in anticipation that the inclusion of the three adult dependents could face unwanted scrutiny in the bankruptcy proceedings:

> A. The first means test was amended, I think, when the issue came up as to their qualifying with two versus five household members. It was originally based on the figures that I had to work with, that they would have qualified with two members. So we amended the schedules just to, basically, take off the dependents so that that wouldn't be an issue involved in this court proceeding.
>
> Q. You were kept abreast by me in regard to the status of the underlying objection . . .?
>
> A. Yes.
>
> Q. All right. And . . . did you and I have a discussion in regards to your representation here, that we discussed, if your opinion is in the first schedule, it shouldn't ... don't need dependents, let's get rid of that as an issue for the purpose of trial to clean things up?
>
> A. Yes, that would be correct.

*Id.* at 282–84.

Finally, in the Third Means Test, the Debtors again changed the household size from two to four. *Id.* at 68. Mr. Kenworthy testified that due to other amendments made in the Third Means Test, namely the inclusion of inadvertently omitted income, the Debtors no longer satisfied the means test with a household size of two. *Id.* at 284–85. According to Mr. Kenworthy, two dependents needed to be added to meet the means test:

> Q. All right. So originally you said, no, we don't need any [dependents to satisfy the means test], but after the examination, their income went up and you needed to declare. Now, how many dependents, household members, have to be declared in your third test to meet the means test?
>
> A. Two dependents.

*Id.* at 285. Regarding his reason for omitting Tanner Kerschner as a dependent in the Third Means Test, Mr. Kenworthy testified:

> A. . . . The one dependent I don't think would qualify based on the information I had given to me after the original schedules were filed, that the one son made significant income and I felt that he could not be considered as a dependent in that situation.

*Id.*

During trial, the Debtors sought to justify their inclusion of their adult children and their daughter's adult boyfriend, Blaine Hardin, as dependents. Mr. Kerschner testified that Mr. Hardin lived with the Debtors, did not contribute to household expenses, and that the Debtors supported Blaine financially by buying all his food and clothing. *Id.* at 142–43, 149. Mr. Kerschner testified that he knew Mr. Hardin had an income, but he guessed that Mr. Hardin spent money on heroin. *Id.* at 150–51, 153. Mr. Hardin testified that, in 2018, he worked full-time for three different employers. *Id.* at 228–29. Mr. Hardin's income tax records introduced at trial corroborated Mr. Kerschner's testimony. According to those records

11

received from employers three W-2s for 2018. *See* Joint Ex. 33. In 2018, Mr. Hardin earned a total income of $41,445. Tr. at 231, Joint Ex. 33. Mr. Hardin testified that he spent some of his income on "partying," but also used his money to pay expenses for himself and his girlfriend, Taylor Kerschner-Moody. *Id.* at 234, 237. Mr. Hardin testified that his income was used to purchase tools and vehicles, pay his telephone and car insurance bills, pay his taxes, and pay for means and entertainment for himself and Ms. Kerschner Moody. *Id.* Mr. Hardin confirmed that the Debtors did not know how he spent his income, that he did not share that information with them, and that they did not have access to any of his financial records or accounts. *Id.* at 231–32.

In the lead up to the bankruptcy, the record showed that the Debtors' son, Tanner Kerschner, had also been employed and frequently lent money to his parents. *See, e.g.*, *Id.* at 143, 169. The Debtors, however, did not include either Mr. Hardin's income or Tanner Kerschner's income in their income and expenses filings. *Id.* at 269–70.

### b.   Income

The Debtors' Bankruptcy filings were inconsistent with respect to their reported income and could not be reconciled with the Debtors' financial records. For example, records indicate that Rhoads Construction paid TLK $48,145 in 1099 income in 2018. Joint Exhibit 10, p. 2. However, the Debtors only reported $30,914.73 as gross income in their initial petition. Joint Exhibit 1, p. 44. The Debtors then listed their gross income as $18,001 in their Amended SOFA, and $37,953.50 in TLK's profit and loss statement provided to the Debtors' Chapter 7 trustee. Tr. at 82–87; Joint Exhibit 4, page 2 of 8; Joint Exhibit 15, p. 22. Likewise, the Debtors' Amended I & J reflect a gross income of $34,796. Tr. at 87–88; Joint Ex. 2, p. 8.

The Kerschners admitted that they failed to provide complete records of their income to their attorney for their initial filing, and the income was initially underreported as a result of these omissions and other computation errors that they failed to catch in their review. *See, e.g.* Tr. at 133, 210, 261–62, 284. The Kerschners also failed to disclose certain sources of income to their attorney. For example, Angela Kerschner testified that the Kerschners received thousands of dollars in 2018 from Walter Kerschner's mother, Jane Kerschner. *Id*. 166–67. According to Mrs. Kerschner that money was intended to cover legal expenses, which were deducted as a business expense of TLK. *Id.* Mrs. Kerschner confirmed also that the funds received from her mother-in-law was never disclosed to the Debtors' bankruptcy attorney. *Id.* Additionally, as discussed above, it is undisputed that the Kerschners omitted the income of Tanner Kerschner and Blaine Harden from their bankruptcy filings, despite listing both as dependents in their initial petition. *Id.* at 269–70, 285.

  **c. Expenses**

Several items identified as TLK's business expenses were apparently not actually business expenses. For example, the Debtors included legal fees as TLK business expenses, a portion of which related to the Debtors' personal legal representation. *See id*. at 179–84. The Debtors' bankruptcy attorney, Mr. Kenworthy, confirmed that he only represents the Debtors in a personal capacity. *Id.* at 297–98. Therefore, his professional legal fees, which were included in the $5,400 listed as TLK legal expenses, were not actually a TLK business expense. In addition, Mr. Kerschner admitted that the TLK general ledger's "outside services" expense item reflected multiple charges for jiu jitsu classes. *Id.* at 119. He testified that the card was inadvertently charged for that personal expense, which was caught and changed after a few months. *Id.* There is no suggestion those funds were ever repaid.

There were also questions raised related to other items identified as business expenses, with the Debtors at times unable to recall whether certain expenses were properly characterized as business expenses. For example, the Debtors claimed $4,489.76 in "meals and entertainment" expenses. *Id.* at 173. However, Mr. Kerschner testified that he had "no clue" if the company did any sort of business development and could not identify any entertainment expense the company had, despite operating the business exclusively with his wife. *Id.* at 97–98, 123. A portion of the "meals and entertainment" expenses corresponded to Mr. Kerschner purchasing fast food meals. *Id.* at 99–105. Mr. Kerschner testified for the first time at trial that these purchases reflected business expenses for meals that he purchased for himself and the employees he supervised in the course of his employment with Rhoads Construction. *Id.* However, the TLK General Ledger showed that the Debtors continued to consistently expense meals after mid-September 2018, at a time that Mr. Kerschner no longer worked for Rhoads Construction and thus would not have been purchasing meals for his employees. *Id.* at 174–75, 177–79.

## C.    Debtors' Bankruptcy Attorney's Representation

The Court also heard testimony from the Debtors' bankruptcy attorney Mr. Kenworthy. *Id.* at 248–49. Mr. Kenworthy testified as to his practices in preparing a bankruptcy filing when working with prospective bankruptcy clients. *Id.* at 249–50. He testified that he asks his bankruptcy clients to provide a variety of items and documents, including paystubs from their last six months of employment. *Id.* If the prospective clients are self-employed, Mr. Kenworthy testified that he asks for a "month-by-month breakdown of income and expense information." *Id.*

14

Throughout their testimony, both Debtors asserted that they relied on Mr. Kenworthy with respect to completion of their bankruptcy filings. *See, e.g., id.* at 208 (A. Kerschner testimony) ("Q. Did you rely totally on Mr. Kenworthy to take the raw information and make it work? A. Yes."). In fact, Mr. Kerschner testified that he did not take affirmative steps to verify the accuracy of the bankruptcy filings:

> Q: Okay, but as far as, you know, this actual document that is in front of us as [the Second Means Test], you didn't actually take any steps to verify accuracy did you?
>
> A. I relied upon my bankruptcy attorney to make sure that the numbers were correct.
>
> Q. Okay, so you provided him the information and then he put into the form...
>
> A. I, I provided him with the information, I don't know what he done with it after that, sir. We gave him everything.
>
> Q: Okay, so you gave him everything and then he filled out [The Second Means Test] and then you signed it assuming that he did the right thing, right?
>
> A. Yes.

*Id.* at 57–58.

Despite their insistence that the Debtors gave Mr. Kenworthy "everything" that they had with respect to income and expenses, *see, e.g.*, *id.* at 53, 57, 133, trial testimony revealed that throughout the process of filing for bankruptcy relief and subsequent amendments, the Debtors did not provide Mr. Kenworthy with complete and accurate information and documents relevant to their income and expenses. Mr. Kerschner testified that Mr. Kenworthy raised concerns early on about their ability to reconstruct their income for purposes of filing bankruptcy and that he asked them to bring supporting documents for verification. *Id.* at 133. However, Mrs. Kerschner admitted that at least one paycheck "was

missed" and so not initially provided to Mr. Kenworthy in preparing their bankruptcy filings. *Id.* at 210; *see also id.* at 133 (Mr. Kerschner testifying that they provided "everything" except one check that was inadvertently written to him personally). Other information about income and expenses was apparently not provided to Mr. Kenworthy. *See, e.g., id.* at 166–67 (Angela Kerschner testifying that the Debtors received thousands of dollars from her mother-in-law, Jane Kerschner, that were not disclosed to Mr. Kenworthy); *id.* at 270 (Mr. Kenworthy testifying that he was unaware at the time of filing that Tanner Kerschner and Blaine Hardin had income); *id.* at 285 (Mr. Kenworthy testifying that he did not include Tanner Kerschner as a household member on the Third Means Test because he learned *after* the original schedules were filed that Tanner made significant income); *id.* at 276–77 (Mr. Kenworthy testifying that he did not receive the Debtors' QuickBooks accounting documentation until after their initial schedules were filed); *id.* at 265–66 (Mr. Kenworthy testifying that Angela Kerschner provided a spreadsheet containing new information about TLK expenses two years after the initial petition date).

Importantly, Mr. Kenworthy testified that only after reviewing the Plaintiffs' Expert Report did he learn of errors in the initial filings[5] and did he receive additional expense information from the Debtors:

> Q . . . you learned about both of these paystub issues after you reviewed Mina Khorrami's report, correct?
>
> A. Yes.

---

[5] Mr. Kenworthy did acknowledge that one error within the Debtors' initial filings was apparently the result of a mathematical miscalculation he or one of his staff members made. *See* Tr. at 264 (Kenworthy testimony confirming that one of Angela Kershner's paystubs was missed due to a "computations error"); *see also id.* at 209 (Angela Kerschner testimony that Mr. Kenworthy informed her of a mathematical error in adding up paystubs.)

> Q. Now, as part of filing the third means test, you also received some new information from the Kerschners about the TLK expenses, correct?
>
> A. Yes, I did.
>
> Q. And that new information was that spreadsheet of TLK expenses that we saw in Exhibit 18, right?
>
> A. Yes.
>
> Q. And that spreadsheet was provided to you on December 31st of 2020?
>
> A. Yes.
>
> Q. Which was over two years after the bankruptcy case was filed, right?
>
> A. Yes.

*Id.* at 265; *see also id.* at 265–69 (Mr. Kenworthy and Plaintiffs' counsel discussing the differences in TLK's expenses contained in the original petition and schedules filed in the case compared to the information included in the Third Means Test). Ultimately, Mr. Kenworthy confirmed that throughout the course of the bankruptcy, he continued to receive new information from the Debtors:

> Q. And you mentioned that there were a number of amendments that were filed, including the SOFA and adding some things to the schedules. Those amendments were prompted by new information that you received, and you felt it was appropriate to file amendments based on that new information, correct?
>
> A. Correct.

*Id.* at 298.

Beyond the specific information and documentation that the Debtors did not initially provide to Mr. Kenworthy, significant information that Mr. Kenworthy used to create the bankruptcy filings were based on inputs made by the Debtors (namely, Mrs. Kerschner).

17

Those inputs themselves have been shown to contain a variety of errors or missing information, amounting to additional information not known to their bankruptcy counsel. *See, e.g.*, *id.* at 97–108, 123, 175–78 (TLK's general ledger lists meals and entertainment expenses for TLK, but the Debtors' testified that they had "no clue" whether TLK did any business development or had any entertainment expenses, and expenses for meals appear to correspond to personal meals for Mr. Kerschner), 119 (TLK's general ledger includes "Outside Services" expense that reflects multiple charges for Mr. Kerscher's jiu jitsu gym membership), 179–84, 297–98 (TLK's Expense Summaries contain expenses for the Debtors' personal legal fees).

Mr. Kenworthy testified as follows regarding his need to rely on information provided by the Debtors:

> Q. Did you make a herculean effort here over the period of time to require Angela to do further research in order to clarify to you and bring to you, the best she could, the exact expense item, the check or a bill that would allow you to appropriately recategorize every deduction?
>
> A. Yeah, I did the best I could on it. It's... I'm sure that it isn't any different than a lot of self-employed people that end up in Bankruptcy Court. Obviously, their documentation and so forth is sometimes not what we would hope for because they're not as thorough as some other bigger businesses are and so, yes, we tried to be as accurate as we could.
>
> . . .
>
> Q. . . . Do you agree that the TLK bank account accurately reflected all income and all expenses?
>
> A. That was my understanding. Everything was going to this one account, part of this was business expenses, part of this was their personal expenses, which made it next to impossible for me to try to sort out what was business versus what was their personal

18

> expenses. So, yes, I depended on Angela to get those figures together to me so that I could make an accurate calculation here.
>
> Q. . . . Do you agree that the TLK bank account accurately reflected all income and all expenses?
>
> A. That was my understanding. Everything was going to this one account, part of this was business expenses, part of this was their personal expenses, which made it next to impossible for me to try to sort out what was business versus what was their personal expenses. So, yes, I depended on Angela to get those figures together to me so that I could make an accurate calculation here.

*Id*. at 278–79; *see also id*. at 293–96 (Kenworthy Testimony discussing how Mrs. Kerschner provided him with the Debtors' financial information to include in the original petition and schedules and the addition new figures two years *after* the initial bankruptcy filing).

## D.    Expert Testimony

As noted, the Plaintiffs retained then-attorney Ms. Nami Khorrami as a bankruptcy expert for the purposes of preparing an independent means test. Joint Ex. 21 at 1 (the "Expert Report"). In conducting her initial review, Ms. Khorrami examined the six-month statutory "look-back" period before the filing of the Debtors' petition, June 1, 2018 through November 30, 2018, and "considered the documents relevant to the 6-month period in [her] evaluation of the means test in this case." *Id*. The specific documents reviewed are listed in the appendix of the Expert Report. *See id*. at 4.

The Plaintiff's bankruptcy expert reviewed the Debtors' various means tests and other filings, and also conducted a number of her own means test calculations using the underlying documentation the Debtors supplied related to their income and expenses. Tr. at 315, 318–24. Ms. Khorrami indicated that her independent review led to the conclusion that the Debtors had understated their income and overstated their expenses on all versions of their means tests filed in the case. Joint Ex. 21 at 1–2. Notably, Ms. Khorrami's independent review

19

of the Debtors' underlying documentation revealed "several inconsistencies in the amount of income and expenses reported by the Debtors," which Ms. Khorrami could not reconcile. *Id.* Ms. Khorrami's review also revealed that paystubs for both Debtors were omitted from the means test calculations. *Id.* Mr. Kenworthy testified that he was not aware that these paystubs had been missed until he reviewed the Plaintiff's Expert Report. *Id.* at 261–62.

In her review, Plaintiff's bankruptcy expert completed four different means test calculations. In the Expert Report, she described this process, and her assumptions as follows:

> In all 4 ways of calculating the [means test ("MT")], the W-2 income of Debtors was calculated the same way. The difference in calculating the MT lies in the calculation of the business income and expenses of TLK. I relied on the deposition testimony of Mrs. Kerschner who testified that the 2018 Income Tax return for TLK, Statement of Revenues & Expenses – Income Tax Basis and General Ledger are accurate. Accordingly, I calculated the MT in the following 4 ways:
>
> 1) MT based on using the business income and expenses of TLK reflected in TLK 2018 tax return . . .
>
> 2) MT based on using the business income of TLK based on the income reflected in the [TLK Bank Account] for the 6-month period, and using expenses of TLK for the 6-month period reflected in the General Ledger . . .
>
> 3) MT based on using the income and business expenses of TLK reflected in the Statement of Revenues & Expenses – Income Tax Basis . . . and
>
> 4) MT based on the amended Form 122A-1 filed by the Debtors on November 4, 2020, using the same income and expenses for TLK but including the missing paystubs of Debtors from their W-2 income . . .
>
> In general, in calculating the MT, I allowed for business deductions that include actual cash expenses and excluded business deductions for tax purposes, such as depreciation or guaranteed payments to partners. I did not allow a deduction for meals and entertainment in any of the MT calculations since all of these deductions represent the daily meals of Mr. Kerschner personally. I allowed for mileage reimbursement in the MT calculated based on Statement of Revenues & Expenses - Income tax Basis, but not in the other two MT calculations. I allowed certain deductions even though these expenses might not be actual business expenses. I note that the auto and

truck expenses for TLK include vehicle payments that may already be deducted as secured debts on MT, which represents double dipping. I also allowed a deduction for all of the legal and professional expenses, but not all of the legal services benefited the business as they include the legal services provided by the bankruptcy attorney of the Debtors as well as the legal services for providing a defense of the litigation against the Debtors personally. I allowed a deduction for all secured debts, even for the surrendered collateral, and provided a deduction for the administrative expenses of a projected Average Monthly Chapter 13 Plan payment, which is required by the United States Trustee. I also allowed a deduction in each of the MT calculation for a self-employment tax deduction of 15.3% based on net income of business in all of the 3 MT calculation, as claimed by Debtors' counsel.

Joint Ex. 21 at 2–3. The Plaintiffs' bankruptcy expert concluded that in every iteration of the four means test calculations (including the three filed with the Court and the one she prepared), the Debtors failed the means test and thus did not meet the eligibility requirements for relief under Chapter 7. *Id.*

## IV. Legal Analysis

Because denial of a debtor's discharge is a harsh remedy, exceptions should be "strictly construed in favor of the debtor." *United States v. Storey*, 640 F.3d 739, 743 (6th Cir. 2011). The party objecting to the debtor's discharge "bears the burden of proof by a preponderance of the evidence." *Buckeye Ret. Co. v. Swegan (In re Swegan)*, 383 B.R. 646, 653 (B.A.P. 6th Cir. 2008); *see also Barclays/Am. Bus. Credit, Inc. v. Adams (In re Adams)*, 31 F.3d 389, 394 (6th Cir. 1994) (establishing burden of proof for § 727 actions). Still, "a discharge is a privilege, and not a right, and should only benefit an honest debtor." *CM Temp. Servs., Inc. v. Bailey (In re Bailey)*, 375 B.R. 410, 415 (Bankr. S.D. Ohio 2007) (citing *In re Juzwiak*, 89 F.3d 424, 427 (7th Cir. 1996)).

A.      **Section 727(a)(4)(A)'s "False Oath" Discharge Exception**

The Plaintiffs assert that the Debtors' discharge should be denied under § 727(a)(4)(A) because they made false oaths in their bankruptcy documentation, schedules, and subsequent amendments.

"Complete financial disclosure is a prerequisite to the privilege of discharge." *Keeney v. Smith (In re Keeney)*, 227 F.3d 679, 685 (6th Cir. 2000). Under § 727(a)(4)(A), a debtor's discharge must be denied if he "knowingly and fraudulently, in or in connection with the case—made a false oath or account." 11 U.S.C. § 727(a)(4)(A); *see also In re McDonald*, 29 F.4th 817, 821 (6th Cir. 2022) (identifying § 727(a)(4)(A) as an exception "to the general rule that the bankruptcy court will grant a discharge of the debtor's debts. Section 727(a)(4)(A) prevents discharge when the debtor knowingly and fraudulently makes false statements.").

"The fundamental purpose of § 727(a)(4)(A) is to [e]nsure that the trustee and creditors have accurate information without having to do costly investigations." *U.S. Tr. v. Zhang (In re Zhang)*, 463 B.R. 66, 86 (Bankr. S.D. Ohio 2012) (quoting *Jahn v. Flemings (In re Flemings)*, 433 B.R. 230, 237 (Bankr. E.D. Tenn. 2010)). "The emphasis is upon complete disclosure in the initial pleadings that will mold the actions of trustees and creditors, based upon reliable information. Even a single omission may warrant denial of a discharge." *In re Elsass*, 597 B.R. 860, 870 (Bankr. S.D. Ohio 2019).

As the Sixth Circuit Bankruptcy Appellate Panel explained:

> The very purpose of . . . 11 U.S.C. § 727(a)(4)(A), is to make certain that those who seek the shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs. The statutes are designed to insure (sic) that complete, truthful, and reliable information is put forward at the outset of the proceedings, so that decisions can be made by the parties in interest based on fact rather than fiction . . . Neither the trustee

22

> nor the creditors should be required to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight.
>
> . . .
>
> A discharge is a privilege and not a right and therefore the strict requirement of accuracy is a small quid pro quo. The successful functioning of the bankruptcy code hinges upon the bankrupt's veracity and his willingness to make a full disclosure.

*In re Hamo*, 233 B.R. 718, 725–26 (B.A.P. 6th Cir. 1999) (citations omitted).

A false oath objection to discharge requires the objecting party to prove by a preponderance of the evidence that: "1) the debtor made a statement under oath; 2) the statement was false; 3) the debtor knew the statement was false; 4) the debtor made the statement with fraudulent intent; and 5) the statement related materially to the bankruptcy case." *Keeney*, 227 F.3d at 685; *see also In re Hamo*, 233 B.R. 718, 725 (B.A.P. 6th Cir. 1999). "Whether a debtor has made a false oath under section 727(a)(4)(A) is a question of fact." *Keeney*, 227 F.3d at 685.

### 1.    The "Oaths" at Issue

The Plaintiffs argue that the Debtors made multiple false oaths within the following documents filed by the Debtors in their initial bankruptcy filings and subsequent amendments:

- Schedules I and J filed with the Debtors' original petition (Bankr. Doc. 1; Joint Ex. 1 at 38–41);

- Amended Schedules I and J, filed March 27, 2019, and containing business Income and Expense form (the "Amended I & J") (Bankr. Doc. 26; Joint Ex. 2);

- the Statement of Financial Affairs filed with the original petition (the "Original SOFA") (Bankr. Doc. 1; Joint Ex. 1 at 43–50);

- the Amended Statement of Financial Affairs, filed January 7, 2021 (the "Amended SOFA") (Bankr. Doc. 35; Joint Ex. 4);

- The First Means Test (Bankr. Doc. 1; Joint Ex. 1 at 52–53);

- The Second Means Test, filed on November 4, 2020 (Bankr. Doc. 34; Joint Ex. 3); and

- The Third Means Test, filed on January 7, 2021 (Bankr. Doc. 36; Joint Ex. 5).

### 2.    False Statements, Made Under Oath, Materially Related to the Bankruptcy

It is clear that the Debtors made statements under oath that were false and materially related to their bankruptcy case. There is no dispute that the statements at issue were made under oath. The rule is well established that "[s]tatements in a debtor's bankruptcy schedules are given under penalty of perjury. Statements made during the meeting of creditors are made under oath. Statements during depositions or a Rule 2004 examination are also under oath." *In re Perez*, No. 18-8036, 2019 WL 7341580, at *8 (B.A.P. 6th Cir. Dec. 30, 2019) (citations omitted). And "[f]or purposes of § 727(a)(4)(A), statements made by a debtor in . . . the statement of financial affairs constitute statements made under oath." *In re Riley*, No. 16-14370, 2021 WL 4227701, at *21 (Bankr. S.D. Ohio Aug. 11, 2021) (Buchanan, J.) (citing *Noland v. Johnson (In re Johnson)*, 387 B.R. 728, 743 (Bankr. S.D. Ohio 2008)). For that reason, "any false statement, relating to the debtor's assets and financial circumstances, made by a debtor in his schedules, at a meeting of creditors, or during a deposition could potentially lead to denial of a debtor's discharge under § 727(a)(4)(A) if all of the required elements to establish that exception are proven." *Perez*, 2019 WL 7341580 at *8; *see also Gandy v. Schuchardt (In re Gandy)*, 645 F. App'x 348, 352 (6th Cir. 2016) ("False statements in the debtor's schedules are sufficient to justify the denial of discharge.").

Here, the documents at issue were signed by the Debtors under penalty of perjury. *See* Bankr. Docs. 1, 26, 34, 35, 36; *see also* Tr. at 44–45, 50–60 (Walter Kerschner confirming signature on bankruptcy filings under penalty of perjury); and *id.* at 158–59, 161–63 (Angela Kerschner confirming signature on bankruptcy filings under penalty of perjury). Therefore,

24

all the statements at issue here were made under oath and this element is proved by a preponderance of the evidence.

With respect to the element of falsity, "[e]rrors and omissions from a debtor's bankruptcy schedules and statements can constitute false oaths under § 727(a)(4)." *In re Tiscareno*, 551 B.R. 1, 15 (Bankr. N.D. Cal. 2016). Here, there is ample evidence, including the Debtors' own admissions, that there were errors and omissions in the information provided in the Debtors' bankruptcy petition, schedules, and amendments. *See, e.g.*, Tr. at 133, 210 (pay stubs for both debtors erroneously omitted from initial filings), 269–70 (income of Tanner Kerschner and Blaine Harden omitted from income and expenses filings), 166–67 (money provided by Walter Kerschner's mother omitted from income and expense filings), 179–84 (legal fees included as a TLK business expenses related to the Debtors' personal legal representation). This is sufficient to establish the element of "falsity" under § 727(a)(4)(A). *See, e.g.*, *In re McWhorter*, 557 B.R. 543, 557 (Bankr. E.D. Ky. 2016).

Likewise, the Court easily finds that the false oaths at issue are material to the Debtors' bankruptcy case. "The subject of a false oath is material if it 'bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property.'" *Keeney*, 227 F.3d at 685–86 (citations and some internal quotation marks omitted); *see also In re Perez*, No. 18-8036, 2019 WL 7341580, at *8 (B.A.P. 6th Cir. Dec. 30, 2019). A statement made in a schedule or SOFA is considered "material" if it "concerns the discovery of assets, business dealings or [the] existence or disposition of property." *Hamo v. Wilson (In re Hamo)*, 233 B.R. 718, 725 (B.A.P. 6th Cir. 1999) (citations omitted). "Consequently, an intentional failure to disclose an asset or property transfer, even if the asset is ultimately deemed worthless, can support a denial of

discharge." *In re Bruce*, No. 15-13536, 2019 WL 11639533, at *8 (Bankr. S.D. Ohio Sept. 16, 2019). The reason for this is that "the trustee and creditors should be entitled to judge for themselves what assets hold value and benefit to the estate. Indeed, the completeness and veracity of the debtor's statements are essential to the successful administration of the Bankruptcy Code." *Id.*

The test for determining whether a false oath is material does not require that the false oath "would have changed [something] with respect to the case or produced an asset or other benefit to the estate." *In re Gandy*, 645 F. App'x 348, 354 (6th Cir. 2016). "In determining whether or not an omission is material, the issue is not merely the value of the omitted assets or whether the omission was detrimental to creditors." *Id.* Instead "a false oath is material if it bears a relationship to the bankrupt's business transactions." *Id.* (internal citations omitted); *see also In re McWhorter*, 557 B.R. 543, 557 (Bankr. E.D. Ky. 2016) ("Materiality is a broad standard under Sixth Circuit precedent[.]"); *In re Dranichak*, No. 10-63042, 2012 WL 2343700, at *8 (Bankr. N.D.N.Y. June 20, 2012), *aff'd sub nom. Dranichak v. Rosetti*, 493 B.R. 370 (N.D.N.Y. 2013), 448 B.R. 122, 129 (Bankr. E.D.N.Y. 2011) ("Unlike the issue of intent, the issue of materiality is straightforward. The threshold of materiality is relatively low: "a false oath is material if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." *Gandy*, 645 F. App'x at 352 (quotations omitted).

The Sixth Circuit in *Gandy* also rejected the debtor's argument that the false statements were not material because they would not affect his Chapter 7 eligibility, noting that the "test for determining whether a false oath is material is not so narrow." *Id.* at 354. Instead, the court found his false oaths to be "plainly material," noting their "relationship to the [debtor's]

business transactions" and their potential impact on "the rights of . . . creditors to file a motion to dismiss, as well as whether a presumption of abuse arose in the case and whether [the debtor] was required to complete additional paperwork." *Id.*; *see also In re Dunne*, No. 15-33831, 2017 WL 1190611, at *4–5 (Bankr. N.D. Ohio Mar. 29, 2017) (rejecting the debtor's "no harm, no foul" argument regarding her misrepresentations as to her marital status, finding the statement to be material even if it would not have changed anything because "it interfered with the Trustee and UST's ability to determine the proper handling of the bankruptcy case based on facts, rather than fiction").

Here, like in *Gandy*, the oaths at issue—which are regarding the Debtors' personal and business income and expenses, and the Debtors' household size—are plainly material, as they clearly "bear a relationship" to the Debtors' business transactions and have a potential impact on creditors' rights. Indeed, the oaths at issue in this case far surpass the wide threshold for materiality under § 727(a)(4)(A) because although "materiality" does not require that the assets at issue be of any value, *see Bruce*, 2019 WL 11639533 at *8, or that those assets would "chang[e something] with respect to the case," *see Gandy*, 645 F. App'x at 354, the oaths at issue here have the significant impact on whether a presumption of abuse arose and, consequently, whether or not the Debtors' are eligible for Chapter 7 relief. Therefore, the Court finds that the element of materiality is easily met here.

### 3. Knowledge & Fraudulent Intent

The remaining two elements to prove a false oath objection to discharge require the Plaintiffs to show that the Debtors made false statements knowingly, and with fraudulent intent. *See, e.g.*, *Keeney*, 227 F.3d at 685.

Regarding the element of fraudulent intent, the Sixth Circuit has stated:

> [I]ntent to defraud "involves a material representation that you
> know to be false, or, what amounts to the same thing, an
> omission that you know will create an erroneous impression." A
> reckless disregard as to whether a representation is true will also
> satisfy the intent requirement. "'Courts may deduce fraudulent
> intent from all the facts and circumstances of a case.'" However,
> a debtor is entitled to discharge if false information is the result
> of mistake or inadvertence.

*Id.* at 685–86 (internal citations omitted); *see also McDermott v. French (In re French)*, 592 B.R.

653, 657 (Bankr. E.D. Mich. 2018). In other words, "[e]ither fraudulent intent or a reckless

disregard for the truth is sufficient to establish the intent requirement." *In re Bruce*, No. 15-

13536, 2019 WL 11639533, at *8 (Bankr. S.D. Ohio Sept. 16, 2019) (citing *Keeney*, 227 F.3d

at 685–86). "Knowledge may be shown by demonstrating that the debtor knew the truth but

nonetheless failed to give the information or gave contradictory information." *Hamo*, 233 B.R.

at 725. "A false statement or omission that is made by mistake or inadvertence is not sufficient

grounds upon which to base the denial of a discharge, but a knowingly false statement or

omission made by the Debtor with reckless indifference to the truth will suffice as grounds for

the denial of a Chapter 7 general discharge." *Id.*

Further, "[k]nowledge and intent may be deduced from all of the facts and

circumstances of a case, including the course of conduct of a debtor." *In re Bruce*, No. 15-

13536, 2019 WL 11639533, at *8 (Bankr. S.D. Ohio Sept. 16, 2019); *see also In re West*, 328

B.R. 736, 750 (Bankr. S.D. Ohio 2004). "[A] combination of errors and omissions that

individually may not rise to the level necessary to deny discharge, when taken in the

aggregate, may evidence the requisite fraudulent intent or recklessness." *In re Capra*, No. 15-

15907, 2016 WL 5106994, at *10 (Bankr. N.D. Ohio Sept. 19, 2016). "A debtor's intent may

be inferred from circumstantial evidence or from the debtor's course of conduct." *In re Hamo*,

233 B.R. 718, 724 (B.A.P. 6th Cir. 1999) (citations omitted); *see also In re Courtney*, 351 B.R.

491, 506 (Bankr. E.D. Tenn. 2006) ("Reckless disregard or indifference for the truth also demonstrates fraudulent intent. Likewise, intent may be inferred from the Debtor's conduct, and a continuing pattern of omissions and/or false statements in his bankruptcy schedules exhibits reckless indifference.") (internal citations omitted).

In distinguishing between honest mistakes or inadvertence, and the requisite wrongful intent, courts have found "two considerations [ ] helpful: (1) the extent and the degree of the misinformation; and (2) whether there existed a motive to provide the misinformation." *In re Newell*, 321 B.R. 885, 890–91 (Bankr. N.D. Ohio 2005) (discussing wrongful intent under § 727(a)(2), but also finding that "the standard necessary to support a finding of knowingly making a false statement with the intent to defraud [under § 727(a)(4)(A)] is, for all practicable purposes, identical to the standard required to support a finding of fraudulent intent under § 727(a)(2)"). "Often, resolution of the question of whether a false statement was made with intent to deceive will turn on the Court's assessment of the demeanor and credibility of the debtor." *West*, 328 B.R. at 750.

In this case, the cumulative effect of the Debtors' errors and omissions related to their income and expenses are sufficient to demonstrate at least a reckless disregard for the truth, which is sufficient to establish the intent element under § 727(a)(4)(A). Starting with the petition, and in contravention of their duties under 11 U.S.C. § 521(a), the Debtors repeatedly filed information with the Court that inaccurately reported their income and expenses.

### i.    Debtors' Income & Expenses

Under 11 U.S.C.A. § 101, "current monthly income" is defined as:

(A) . . . the average monthly income from all sources that the debtor
      receives (or in a joint case the debtor and the debtor's spouse
      receive) without regard to whether such income is taxable income,
      derived during the 6-month period ending on—

> > (i) the last day of the calendar month immediately preceding the date of the commencement of the case if the debtor files the schedule of current income required by section 521(a)(1)(B)(ii); or
> >
> > (ii) the date on which current income is determined by the court for purposes of this title if the debtor does not file the schedule of current income required by section 521(a)(1)(B)(ii); and
>
> (B)(i) includes any amount paid by any entity other than the debtor (or in a joint case the debtor and the debtor's spouse), on a regular basis for the household expenses of the debtor or the debtor's dependents (and in a joint case the debtor's spouse if not otherwise a dependent)

11 U.S.C.A. § 101(10A)(A)–(B)(i). Otherwise stated, "[u]nder this section, the Debtors' current monthly income is the average monthly income they receive from all sources, without regard to whether such income is taxable, derived during the six full calendar months preceding the filing of their bankruptcy petitions; their current monthly income includes amounts paid by any entity other than the Debtors on a regular basis for the household expenses of the Debtors or the Debtors' dependents, but excludes specified kinds of benefits and payments." *In re Harkins*, 491 B.R. 518, 525 (Bankr. S.D. Ohio 2013).

Under 11 U.S.C. § 1325, debtors may take expenses that are "reasonably necessary" to be expended:

> (A)(i) for the maintenance or support of the debtor or a dependent of the debtor, or for a domestic support obligation, that first becomes payable after the date the petition is filed; and
>
> . . .
>
> (B) if the debtor is engaged in business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business.

11 U.S.C.A. § 1325. Under the means test, "[a] debtor's 'reasonably necessary' expenses . . . are fixed by the Internal Revenue Service ("IRS") National Standards and Local Standards." *In re Skiles*, 504 B.R. 871, 875 (Bankr. N.D. Ohio 2014).

The evidence adduced at trial clearly demonstrates that the Debtors went well beyond making honest mistakes or inadvertence regarding their income and expenses. The numerous errors, inconsistencies, and misstatements committed by the Debtors in this case include: (1) omissions from the Debtors' income and expense filings, including omission of the income earned by their household members, Tr. at 269–70, omission of money received from Walter Kerschner's mother, *Id.* at 166–67, and omission of pay stubs for both debtors, *Id.* at 133, 210, (2) misstatements of TLK's expenses, including meals & entertainment, *Id.* at 97–108, 123, 173–78, and inclusion of personal legal fees, *Id.* at 179–84, (3) and various inconsistencies within the three means tests filed. The extent and the degree of misinformation contained in the Debtors' reported income and expenses show an intent to deceive. Moreover, from their testimony the Debtors were highly motived to provide misinformation to the Court in order to qualify under the means test to remain eligible for Chapter 7 relief.

### ii.      Debtors' Household Size & Purported Dependents

Further, Debtors' ever changing household size and omission of household members' income supports a finding of reckless disregard for the truth, which is sufficient to establish the intent element under § 727(a)(4)(A).

In a Chapter 7 case, if a debtor's annualized income is greater than the applicable median family income, 11 U.S.C. § 707(b)(2) requires the debtor to complete a series of calculations to determine if the bankruptcy case is presumed to be an abuse of the Bankruptcy Code. This computation allows the debtor several income reductions and expenses, including

(among other items not relevant to this analysis) expenses for the support of "dependents" as follows:

> The debtor's monthly expenses shall be the debtor's applicable monthly expense amounts specified under the National Standards and Local Standards, and the debtor's actual monthly expenses for the categories specified as Other Necessary Expenses issued by the Internal Revenue Service for the area in which the debtor resides, as in effect on the date of the order for relief, for the debtor, *the dependents of the debtor*, and the spouse of the debtor in a joint case, if the spouse is not otherwise a dependent. Such expenses shall include reasonably necessary health insurance, disability insurance, and health savings account expenses for the debtor, the spouse of the debtor, *or the dependents of the debtor.*

11 U.S.C. § 707(b)(2)(A)(ii)(I) (emphasis added). The debtor performs the required computation, otherwise referred to as the "means test," on Official Form 122A in accordance with Fed. R. Bank. P. 1007.

Form 122A is comprised of three parts: (1) 122A-1: Statement of Current Monthly Income; (2) 122A-1 Supp: Statement of Exemption from Presumption of Abuse Under § 707(b)(2); (3) 122A-2: Chapter 7 Means Test Calculation. Form 122A-2 directs the debtor to assess expenses related to support of "dependents" on various lines, though the form does not define who can be claimed as a "dependent." Furthermore, line 5 of 122A-2 directs the debtor, in deciding the "number of people used in determining your deduction from income," to:

> Fill in the number of people who could be claimed as exemptions on your federal income tax return, plus the number of additional dependents whom you support. This number may be different from the number of people in your household.

However, the Bankruptcy Code does not define the terms "household," "family," or "dependents." *See, e.g.*, *In re Jewell*, 365 B.R. 796, 800 (Bankr. S.D. Ohio 2007). Nor, for that

32

matter, has the United States Supreme Court or the Sixth Circuit Court of Appeals addressed the meanings of the terms "dependent" or "household size" for purposes of calculating the "means test" under Chapter 7. The Bankruptcy Appellate Panel for the Sixth Circuit has also not addressed this issue.

Across the case law, there appears to be a general consensus that three methods exist by which bankruptcy courts define the scope of "dependents" and/or "household size" for purposes of the "means test." These include: (1) the economic unit test; (2) the Internal Revenue Service ("IRS") tax return "dependents" test; and (3) the "heads on bed," pursuant to either Census Bureau or ordinary meaning, test. Some courts have characterized the economic unit test as the majority approach. *See, e.g.*, *In re Thomas*, No. 17-03558-NPO, 2018 Bankr. LEXIS 2380, at *12 (Bankr. S.D. Miss. Mar. 22, 2018) (joining "the majority of courts in adopting the economic unit approach"). However, the word "majority" oversimplifies the status of the caselaw: across all of these methods of defining "dependents," including the economic unit test, there are several variations within each based on case-by-case analysis.

In this case, the Court need not determine whether Blaine Hardin, Tanner Kerschner, or Taylor Kerschner-Moody qualify under the legal definition of "dependents" for purposes of analysis of the false oaths exception to a Chapter 7 discharge. First, the Debtors' false oaths related to their income and expenses suffice to support a finding under 727(a)(4)(A) without regard to the issue of household size. Second, after considering the totality of circumstances, the fact that the Debtors changed the numbers of claimed dependents (using adult individuals, one of whom had no relation to them) in the three different means tests filed in this case clearly supports an inference of knowing fraudulent intent on their part. *See West*, 328 B.R. at 750 ("[A] combination of errors and omissions that individually may not rise to the level

necessary to deny discharge, when taken in the aggregate, may evidence the requisite fraudulent intent or recklessness."); *Bruce*, No. 15-13536, 2019 WL 11639533, at *8 ("Knowledge and intent may be deduced from all of the facts and circumstances of a case, including the course of conduct of a debtor.").

### iii.    Further Indicia

Mr. Kerschner provided additional indicia of a reckless disregard or indifference for the truth when he admitted that he likely did not review certain documents filed in the bankruptcy, despite signing them under penalty of perjury. *See* Tr. at 56–60. See *In re McWhorter*, 557 B.R. 543, 557 (Bankr. E.D. Ky. 2016) ("An item that affected the impression of the Debtor's credibility was his failure to give a direct answer when his attorney asked him if he thought the petition was accurate when filed.")

All of these facts and circumstances are compounded by a potential motive to provide misinformation: the desire to remain Chapter 7 eligible and avoid having to file under Chapter 13 or another chapter, which would require surviving the presumption of abuse. See *In re Newell*, 321 B.R. 885, 890–91 (Bankr. N.D. Ohio 2005) (stating that one way "to distinguish between honest mistakes or inadvertence, and the requisite wrongful intent," is to consider "whether there existed a motive to provide the misinformation.")

### iv.    Effect of Amendments on Intent Analysis

While the Debtors may argue that their multiple amendments in this case negate any inference of fraudulent intent, this argument is unavailing. It is true that courts have found that efforts to cure omissions or misstatements in bankruptcy filings can indicate a lack of fraudulent intent. *See, e.g.*, *Eifler v. Wilson & Muir Bank & Tr. Co.*, No. 3:13-CV-00785-JHM, 2014 WL 314473, at *11–12 (W.D. Ky. Jan. 28, 2014), *aff'd*, 588 F. App'x 473 (6th Cir. 2014).

However, fraudulent intent may still be found in the original petition, and it may still be inferred if the amendments were compelled by a fear of discovery of the errors. As one New Jersey district court observed:

> While subsequent amendments to one's petition may rectify an honest mistake, such amendments will not expunge any fraud in the falsity of a statement set forth in the original petition. *Spitko,* 357 B.R. at 313; *Moore v. Strickland (In re Strickland),* 350 B.R. 158, 164 (Bankr.D.Del.2006) (finding that the amendment of the debtor's schedules to reflect her interest in a business did not negate the conclusion that the omission was intended to mislead or defraud her creditors). Indeed, fraudulent intent has been inferred despite a debtor's subsequent disclosure of omitted assets where such disclosure was "compelled" by the court or by fears that the omitted assets would soon be discovered. *See Strominger v. Giquinto (In re Giquinto),* 388 B.R. 152, 181 (Bankr.E.D.Pa.2008) (finding an absence of fraudulent intent where the debtor's submission of an amended petition was voluntary and not the result of fears that the omitted assets would be discovered); *Spitko,* 357 B.R. at 313 (explaining that a debtor's omission of an asset that is already known to the trustee or a creditor will not be excused even when the debtor belatedly discloses that asset); *Dolata,* 306 B.R. at 153–54 (finding fraudulent intent and denying discharge despite amendment because the subsequent disclosure was compelled by the court). In addition, where a debtor's underreporting or omission of assets is at issue, "no carelessness [can] excuse the Debtor's failure to amend his schedules promptly when he had the leisure to do so." *Zimmerman,* 320 B.R. at 810.

*In Re Corona*, No. 08-15924 (DHS), 2010 WL 1382122, at *10 (D.N.J. Apr. 5, 2010); *see also McWhorter*, 557 B.R. at 557 (finding the debtor's argument that an amendment to his SOFA to correct previous errors and omissions did not demonstrate a lack of fraudulent intent where the debtor's amendment and admissions "all occurred after the Trustee became aware of the [previously undisclosed] transfers through his own independent investigations," which supported an "easy" determination that the debtor had "knowingly and intentionally made false statements and omissions" under the false oaths exception to discharge).

Similarly, here, while the Debtors did make amendments to their schedules, means tests, and SOFA, these amendments do not negate an inference of reckless indifference (at best) which is sufficient to justify denial of discharge under the false oaths exception. First, these amendments were made well after the original petition was filed, with some amendments not being made until after this adversary proceeding was filed. And what's more: the amendments themselves still include errors and ultimately contained information that was unable to be reconciled by a bankruptcy expert. *See* Joint. Ex. 21.

In total, this case bears marked similarities to *Gandy v. Schuchardt (In re Gandy)*, 645 F. App'x 348, 352 (6th Cir. 2016). In *Gandy*, the Sixth Circuit affirmed the bankruptcy court's denial of the debtor's discharge under § 727(a)(4)(A). Over the course of two years, the debtor in the *Gandy* case had filed and relied on schedules that reported inaccurate income, inconsistently reported his marital status, and listed educational expenses for a minor child when the debtor had no minor children. His repeated failure to correct any mistakes despite objections from a creditor "gave the bankruptcy court reason to find that [the debtor] had acted with the requisite fraudulent intent." *Id.* at 353. And especially given the pattern and delay in correction, the court did not find convincing the debtor's arguments that the inaccuracies were due to mistake or inadvertence.

In conclusion, the Court finds that the cumulative effect of the Debtors' serial errors and omissions under the circumstances of this case give rise to the inference of a fraudulent intent or, at least, a pattern of reckless disregard for the truth. Therefore, this element is proved by a preponderance of the evidence under § 727(a)(4)(A).

**B.     Advice of Counsel Defense**

As a last resort, the Debtors assert that they are entitled to an advice-of-counsel defense, contending that any falsity or errors in their bankruptcy filings were made in reliance on the advice of their bankruptcy attorney, Gary Kenworthy.

In certain circumstances, reliance on the advice of counsel "can show that the debtor lacked the requisite intent required to deny his discharge." *Eifler v. Wilson & Muir Bank & Tr. Co.*, 588 F. App'x 473, 478 (6th Cir. 2014) (quoting *Buckeye Retirement Co., LLC v. Swegan (In re Swegan)*, 383 B.R. 646, 656 (B.A.P. 6th Cir. 2008)). Such reliance, however, must be reasonable and in good faith. *In re Swegan*, 383 B.R. 646, 656 (B.A.P. 6th Cir. 2008). More specifically—to prevail on the advice of counsel defense, the Debtors must demonstrate "(1) full disclosure of all pertinent facts to counsel, and (2) good faith reliance on counsel's advice." *Eifler*, 588 F. App'x at 478–79.

"A debtor cannot, merely by playing ostrich and burying his head deeply enough in the sand, disclaim all responsibility for statements which he has made under oath." *Church Joint Venture, L.P. v. Blasingame (In re Blasingame)*, 559 B.R. 692, 699 (B.A.P. 6th Cir. 2016) (ultimately quoting *Boroff v. Tully (In re Tully)*, 818 F.2d 106, 111 (1st Cir. 1987)). This is because the duty to fully disclose information in bankruptcy filings falls on debtors, *not* their attorneys. *See Eifler v. Wilson & Muir Bank & Tr. Co.*, No. 3:13-CV-00785-JHM, 2014 WL 314473, at *11 (W.D. Ky. Jan. 28, 2014), *aff'd*, 588 F. App'x 473 (6th Cir. 2014) (finding that the debtor could not "simply hope to dump 'all of the pertinent financial documents'" on his attorney and then argue a reliance-on-counsel defense, particularly where the attorney used a method of having clients review their forms multiple times and instructed clients to make corrections, and where the debtor could not identify any testimony where his attorney advised

37

him to make the omissions that were made). Indeed, "[a] debtor has an affirmative duty to disclose all of its assets to the bankruptcy court." *Browning v. Levy*, 283 F.3d 761, 775 (6th Cir. 2002).

In this case, Debtors' assertion of the advice of counsel defense fails because they failed to fully disclose all pertinent facts to their attorney. As much was admitted by both the Debtors in their testimony and confirmed by Mr. Kenworthy in his. Overwhelming evidence presented at trial clearly shows that Debtors had not fully disclosed to Mr. Kenworthy all their income and expenses in preparation for filing for bankruptcy relief:

- The Debtors did not disclose certain sources of income to Mr. Kenworthy, such as their receipt of thousands of dollars from Mr. Kerschner's mother, Jane Kerchner. Tr. at 166–67.

- Mr. Kenworthy was completely unaware of and apparently had not been told about the extent of income of the Debtors' purported household members. *Id*. at 169–70.

- Mrs. Kerschner admitted that at least one paycheck "was missed" and so not initially provided to Mr. Kenworthy in preparing their bankruptcy filings. *Id*. at 210.

- Mr. Kenworthy testified that he had not been shown the Debtors' QuickBooks accounting documentation until *after* their initial schedules were filed. *Id*. at 276–77.

- Mr. Kenworthy testified that he only received other *additional* income and expense information *after* review of the Plaintiffs' Expert Report. *Id*. at 265–69.

Mr. Kenworthy relied upon the income and expense figures provided by the Debtors, including changes that the Debtors made to those figures over the period from the original petition through the trial for this adversary proceeding. *See id.* at 251–52, 293–97. For example, Mr. Kenworthy used TLK's Expense Summaries created by Mrs. Kerschner for the means test calculations, and he confirmed that he had not seen some of the information included in the Second Expense Summary until he received it in December of 2020—two years after the petition date. *See id.* at 265.

It does seem that the Debtors' relied heavily on Mr. Kenworthy's experience and advice, and there was at least one computation error admitted by Mr. Kenworthy himself. *See id.* at 264, 275 (Mr. Kenworthy explaining a computation error in calculating paystubs); *see also id.* at 209 (Mrs. Kerschner's testimony confirming computation error). Even so, for Debtors to prove the advice-of-counsel defense, it is also incumbent upon them to demonstrate that they provided "full disclosure of all pertinent facts" to their attorney. Because the Debtors' failed to demonstrate full disclosure to their attorney here, their advice-of-counsel defense fails.

## V. Conclusion

For the reasons stated above, the Court finds that the Debtors' discharge must be **DENIED** under § 727(a)(4)(A) of the Bankruptcy Code and that judgment should be granted in favor of the Plaintiffs and against the Debtors. The Court will enter a separate judgment entry in accordance with this opinion.

**IT IS SO ORDERED.**

Dated:  May 22, 2024

Hon. Jeffery P. Hopkins
United States District Judge